Thank you, Your Honor. Please support. Opposing counsel, my name is Anne Brown. I represent Timothy Couch in this case against his former employer, Dr. Pepper. This appeal centers around Tim Couch's claim that he was retaliated against in violation of the Iowa Civil Rights Act when Dr. Pepper, his former employer, gave him his first negative review in 17 years just three days after receiving notice that he'd filed a complaint with the EEOC, delivered this review to him just eight days after receiving notice of such complaint, subsequently and shortly thereafter suspended him and then terminated him. I'd like to, in my short time for oral argument, address an issue that we were not able to fully brief but did alert the Court to in our Rule 28J letter because the Iowa Supreme Court issued a decision directly relevant to this case in June of this year after we'd fully submitted briefing in this case, and that's the Hawkins v. Grinnell mutual case in which the Court set out the appropriate analytical framework and burdens of proof for cases of retaliation or what we call mixed motive retaliation cases under the Iowa Civil Rights Act, which is both different substantially than the framework used under Title VII and different than the framework and burdens of proof used by the district court in this case. The first thing to note is that under the Iowa Civil Rights Act, Iowa recognizes the cause of action for mixed motive retaliation because the causation standard is dramatically different under the Iowa Civil Rights Act. Well, let me ask you this. On the motivating factor test, you know, you're absolutely right. There's a different standard under Iowa law. It's clear from the case law, and maybe Hawkins makes that more clear, but Haskenhoff adopted that and the district court had the benefit, or at least Haskenhoff had been decided, and so what does Hawkins add in your view? So Hawkins, importantly, and clears it up for all of us Iowa lawyers, is a unanimous opinion. So the Haskenhoff was a plurality decision, and in this case, I think that the district court actually miscounted the votes on the causation standard when applying the Haskenhoff decision. So she applied a substantial factor test, which requires either a tips-the-scale finding or a straw-that-broke-the-camel's-back finding, when, in fact, four justices in the Haskenhoff cases had determined it was not substantial factor as a causation standard. It was motivating factor, which simply requires plate apart. What the other rulings that are relevant in the Hawkins case that go beyond just the causation standard being motivating factor and clearing that up after Haskenhoff is that Iowa will not use the burden-shifting framework of McDonnell-Douglas in either retaliation or discrimination cases any longer. That eliminates the requirement that a plaintiff or employee prove pretext, which is- Counsel, is that true at the summary judgment stage? Yes, Your Honor, it is. So I noticed that in the defendant's letter, they noted that there were different standards for summary judgment versus the jury instructions, and I'm not entirely sure where that comes from, but the majority of the circuits- Well, I think it comes from headland versus state. Could you address that? Sure. So the court in the Hawkins case-so pretext is relevant in that it's not required for you to prove, but if you do prove pretext, it's evidence that it was a motivating factor. If you're able to prove pretext, it still goes to causation. The difference being Iowa adopted what the majority of, in fact, the federal circuits do in mixed motive cases because mixed motive cases in federal courts still apply, are still available for discrimination, if not retaliation cases, and the majority of the circuits apply, including at the summary judgment stage. They eliminate the McDonnell-Douglas burden-shifting framework for mixed motive cases, and- But what Eighth Circuit case does that? The majority of the federal circuits do that. Are you saying we don't, and therefore we're out of line, or are you saying this is new? Well, I would say that the Eighth Circuit is- McDonnell-Douglas has only been relevant at summary judgment ever since I came on the court. Sure, but Iowa adopted a different standard under the Iowa Civil Rights Act, and they cite in the Hawkins case to the number of- Hawkins, you mean? You go to the majority of the federal circuits and suggesting the Eighth Circuit is wrong, you're absolutely befuddling me. Sure, so if you, as far as a case that addresses how the federal circuits, the various federal circuits have addressed McDonnell-Douglas in the case of mixed motive cases, the Eleventh Circuit has a case, Quigg v. Thomas County School District, 814 F. 3rd, 1227. Your brief? It's not in our brief because- Put it in at 28J. Sure, and so in that case- Where did they put us in their little- They put the Eighth Circuit as an outlier, as the only circuit that applies McDonnell-Douglas in mixed motive cases, and Iowa adopted the other rule. Well, all right, so why don't you come out and say that? Okay, I- If you want us to not stop being an outlier, go to our in-bank court. So, we're not asking that the Eighth Circuit change its decision with regards to how it interprets Title VII. What we're asking is that the Eighth Circuit acknowledge that what the Iowa Supreme Court has done in mixed motive cases is eliminate the McDonnell-Douglas framework under the Iowa Civil Rights Act. I just want to follow up because I have some experience under Minnesota law in my prior job, and my understanding, at least when I was on the court, was that Minnesota uses McDonnell-Douglas as a summary judgment standard, much like Judge Loken is suggesting. But to my knowledge, we do not instruct the jury on McDonnell-Douglas because it's a really hard standard for jurors to understand. And so to sort of get back to Judge Grouse's question, I think there's- Hedlund suggests that it's still an open question in Iowa, and it may well be that they limit it to just the jury instruction context. So, and I would note that the Supreme Court in Hawkins noted the different standards applied in Minnesota. They referenced the Minnesota standards on mixed motive cases and McDonnell-Douglas, and then they note that they're adopting a different rule, that they're eliminating McDonnell-Douglas analytical framework under the Iowa Civil Rights Act in its entirety for both- Counsel, in footnote number eight in Hedlund, the Iowa Supreme Court says, we did not disturb our prior law as it applies to summary judgment. So I don't understand how there's been any change in Iowa law that the Eighth Circuit can follow until the Iowa Supreme Court clarifies that issue. So, well, I would disagree that they are still applying McDonnell-Douglas for the summary judgment proceeding. If that is, you know, an open issue after this, if the court believes that's an open issue after the Hawkins case, you know, I suppose perhaps that's a question that still needs to be resolved by the Iowa Supreme Court. I just want to throw one more curveball in addition to that, which is under Erie, is McDonnell-Douglas, if it applies to the summary judgment phase, is it procedural or is it substantive? So you mean as far as does this change in Hawkins apply on this appeal? Yeah, because I mean, if it's procedural, then we follow federal law, not state law on that particular issue. So I don't believe that it's procedural. I mean, and I think that the, and I'm not 100% if I'm understanding if your question is do we apply the Hawkins standard to this case since it was decided while this case was putting on appeal? No, I'm just, I'm talking about the summary judgment. If the application of McDonnell-Douglas at summary judgment is procedural because it's tied up in the summary, it's a summary judgment standard, then perhaps we apply federal law, which is the Eighth Circuit standard, and we don't apply Iowa law. And if it's substantive, then we apply Iowa law. Well, I think it's substantive. One of the most substantive things about the change is that under the McDonnell-Douglas framework, the defendants at this stage simply have to come forward with a legitimate reason. And what Iowa has said under the Iowa Civil Rights Act in Hawkins is that the defendants, in fact, are going to carry the burden of proof to prove that an other, that they otherwise would have reached the same decision absent the retaliatory motive. And they carry the burden of proof on this case. And that's not… Take it out of a summary judgment possibility. Well, no, but it means that the defendants have to carry their burden. I mean, it's harder to get summary judgment on an issue in which you carry the burden of proof. And so I think that if the district court decided this under the idea that plaintiffs had to disprove the legitimate reason as part of their case in order to survive summary judgment, and that's not, in fact, the law, the defendants have to prove that they would have reached the same decision absent the retaliatory motive. And they carry the burden of proof on that issue. And, you know, that's important. It's to me like the thing for the Eighth Circuit to do is to stop taking supplemental jurisdiction over Iowa Civil Rights cases. I'm perfectly prepared to do that. If you lose the federal case, you're done in federal court. We have diversity jurisdiction. There's diversity jurisdiction in this case as well. Dr. Pepper is a Texas corporation. So we were in federal court regardless. And so, yes, it does put the court in what may not be its favorite position, which is what we're asking the court to do. Well, in my 25 years, I can tell you it doesn't matter in 95% of the cases. Well, as far as the specific facts of this case, I mean, we think that the issue of motivating factor is important. We think that the court also, the district court also applied the wrong standard for determining what is an appropriate action. I don't see any basis to infer any improper motive on these facts, frankly.  On these facts, we think that one of the errors that the district court made was that they refused to consider this negative employment review as a- I don't understand how that affects the retaliation claim. If the negative performance review was the only adverse action, what would the remedy be here? So we think the primary problem is that- If you think about that, the negative performance review is obviously part of the totality of the circumstances in analyzing the termination adverse employment effect. But what difference does Burlington Northern v. White make to that analysis? In this case, it makes a difference because the court has held that a short time period of three days raises a presumption of a retaliatory motive that is sufficient to survive- We haven't held that. The Eighth Circuit's held in a number of cases that are cited in our brief- Presumption. Well, that it creates enough of a fact issue to generate a fact issue to submit the issue of retaliatory motive to the jury. And that's what we're asking for in this case. I mean, your client created the temporal proximity by the timing of the EEOC complaint. And we've talked about that before. So I don't think that there's any evidence in the record that he filed the EEOC complaint in order to head off a negative employment review. I mean, I think that the- Evidence versus inference. The defendant has asked that the court- There are all kinds of adverse inferences against the defendant. You're not permitting an adverse inference against the plaintiff. That's not the way the analysis works. Well, I think what the court is raising shows that there's a fact issue on whether or not there was a retaliatory motive. The fact issue is whether or not Dr. Pepper prepared a negative review, his first negative review, in 17 years of employment, just three days after receiving notice of an EEOC complaint, then delivered the review to him. There's a fact issue as to what happened during that review meeting. Dr. Pepper has asserted that he refused to complete the review meeting, but Tim Couch has testified that he and his supervisor- That's what pre-summary judgment discovery is all about. Right. That started out. Yeah, and I think that we've created a fact issue. I don't think so. The parties have- You haven't identified it for me this morning. The non-discriminatory reason that the district court thought was sufficient to reach the pretext stage was the behavior at the meeting where the review was reviewed. The district court has said that she concluded that there was no dispute of fact that Tim Couch refused to complete his review meeting. We have asserted that he testified that he did not refuse to complete his meeting, that he stated that he believed the review was unfair, that he stated that it didn't accurately reflect his performance. He asked to have a human resources representative and that his supervisor agreed that they would have a human resources representative present during the review and that they would continue the review. So that's a fact issue. There were two people present at the meeting, and they have different versions as to what happened. And the district court's reason for concluding that there was no fact issue was its conclusion that Tim Couch refused to complete his review process, and he testified to the contrary. What would be the damages here? Suppose that we- You know, Iowa has adopted the Burlington Northern Standard. We don't- It may be different than the way we approach it, but my problem is if you've got an unfavorable performance review, what- It gets back to the remedy issue. What are the damages here? It seems zero. I mean, at least that I could identify. So I think that under the Burlington Northern, you can't consider each individual act separately, that the negative employment review- I mean, our position is that upon receipt of the EEOC complaint, Dr. Pepper set in motion giving him a negative employment review, suspending him, and terminating him, all as one effort to retaliate him. And that those three actions, I think under the Burlington Northern Standard, should be considered jointly in determining and ultimately led to his termination. I mean, our position is that sort of the review was all for the purpose of the ultimate end, which was terminating him. Thank you. Thank you. Ms. Devaney? May it please the court, my name is Jeannie Devaney. I represent American Bottling Company in this instance. I am going to start by talking about the legal issue that you all discussed a moment ago related to the Hawkins decision. We agree that it is clear now under Iowa law that the standard is a motivating factor. I disagree, and I'm not sure I completely understood this a moment ago, but I disagree that right out of the box the burden is on the defendant. I believe that still the plaintiff has to prove that a motivating factor in this instance in terminating his employment and or giving him a review was in fact retaliation. And I also disagree that the notion that there is a motivating factor standard eliminates McDonnell Douglas at the summary judgment stage. As Your Honor pointed out a moment ago, we have this not only in Minnesota, but in federal courts all over. There's McDonnell Douglas analysis at the summary judgment stage, and the jury is never instructed on McDonnell Douglas. The jury is instructed as to the appropriate factor in whatever the case may be, retaliation, motivating factor, determining factor, those kinds of things, when they're actually at trial. And the Hawkins decision specifically says when instructing the jury, that's a quote out of the decision. It doesn't talk about summary judgment. As the court has pointed out, this issue has been raised since then with the Iowa Supreme Court. And there's a footnote indicating that the summary judgment standard has not changed. Counsel, in that regard, normally when both sides agree on something, we would just agree as well. But this court can only follow what the Iowa Supreme Court has said. And in footnote 8 of Hedlund, they said they didn't change their law about summary judgment. So we can't just decide to go with what you say. We have to go with what the Iowa Supreme Court says. That's exactly my point, and I think that's correct. But I would also say this. I don't think it matters what the standard is. You can use motivating factor standard on both the Title VII claim and on the Iowa claim. And you could even give us the burden of proof if you want to do that. It doesn't matter because in this instance, there is no evidence that the actions that Dr. Pepper, is the way we're referring to them in this case, that Dr. Pepper took had anything to do with Mr. Couch's protected activity. I want to start by saying a couple of things just sort of broadly. Mr. Couch was a high-level manager at the plant. He and Mr. Denny were viewed as, well, they were, in fact, running the show on a day-to-day basis. So as he was primarily, Mr. Couch was primarily in the warehouse, he was also running the production floor whenever Mr. Denny was at a conference or on vacation or out sick or whatever it was. So that is one backdrop. The other backdrop is this. We're talking about an interim evaluation. We're not talking about an actual evaluation. And based on Mr. Couch's own testimony, an interim evaluation is intended to tell an employee where he or she stands and what they need to accomplish before the end of the year before the actual evaluation. And so that's what we're talking about here. And I think that's important for two reasons. I think it's important when analyzing the question of whether or not this was materially adverse using the language from Burlington Northern. And I think it's important when you're looking at Mr. Couch's behavior in that meeting. We're talking about his supervisor who had just started six weeks earlier wanting to sit down with him and tell him where he was and where he needed to be by the end of the year. Counsel, let me ask you about that. Sure. I think the district court improperly relied on pre-Burlington Northern precedent when it made that determination. So how should this court handle that? So I don't disagree with that. I think that the Burlington Northern standard is what is proper. But what Burlington Northern says is that the plaintiff still must show that it's materially adverse. This court has interpreted that decision most comprehensively in trying to find it here in the Abachan. I'm not sure I'm saying that right. The Abachan case in 2014. And what this court said at that time was that based on the Supreme Court's language in Burlington Northern, a plaintiff must still prove some kind of injury or harm. And so we're still talking about a situation where anything that happens doesn't count as an adverse action in the retaliation context. Is that the key, though, the injury or harm? And the reason why I ask that is because you have the filing of the EEOC charge and three days later, you have the first negative performance review in 17 years. That does not look good from an adverse inference perspective and could create a tribal issue. So does it all depend on us saying there's no harm if this wasn't material? Well, I think two things. First of all, I believe Mr. Couch created the reason for the negative evaluation in two ways. First of all, he filed the EEOC charge right before he knew he was going to receive an interim evaluation. Whether or not he did that on purpose, I don't know. But it doesn't matter because his midyear evaluations occurred every year in mid-August. So that wasn't going to change.  The behavior that was problematic didn't occur until after his most recent evaluation in March of 2016. The incident with Sandy Hoagland where she reported that he gave her a dirty look and came in and told what we now know as his wife, if you don't think you can do this, then we can get you out of it. And then his subsequent behavior in that meeting with HR, his subsequent behavior in the meeting with Roger Marine in July of 2016, and his subsequent behavior in the meeting in August of 2016, all of that occurred after his last evaluation. But the last thing I think was you're mentioning the performance review. We can't consider that meeting because that didn't contribute to his actual performance review. I agree. That comes in when you're looking at the termination. I agree. But when he goes into the Human Resources meeting in April of 2016, and again, we're talking about somebody who is a high-level manager in the plant, who's dating a production-level employee, who goes in and makes another production employee feel like she's in trouble because she had a disagreement with his wife. He goes into Human Resources. He won't even tell his employer if he's married to a production-line employee. The notes of that interview are in the record, and obviously we don't have time to go through them all right now, but they're at Joint Appendix 239 to 247, which he signed. And if you read through them, you can see how incredibly hostile, just by the language, he was in that meeting. But here's the problem I'm having with it. So your story, and it's supported by the evidence, is that he had all of these incidents that led to a negative performance review. And I get that. And their story is, I filed the charge, and three days later, I received my first negative performance review in 17 years. And so that potentially creates a triable issue on what reason was given. If we assume the negative performance review is, in fact, an adverse employment action, doesn't that create a triable issue? No, I don't think it does because, again, the timing is the timing. He gets his midyear evaluation in August, no matter what. And so he filed the charge on July 29th. I mean, what are we going to do about that? That does not create an inference of retaliation, especially when you look at the facts. He doesn't dispute what he said in the April meeting. He doesn't dispute what he said in the July meeting. He was not acting like a member of leadership. In his very first meeting with his supervisor, two weeks after the new plant manager started, he sits down, again, will not even tell him whether he's married to a production line employee, says that he wants someone to come in to take notes about his conversation with his supervisor. None of this is disputed. And so, first of all, I think it's very clear under the Eighth Circuit case law, using the Burlington Northern Standard, which I agree is the appropriate standard, that it's not an adverse employment action. And if you look at the case law in Avacin, if you look at Jackman, which the district court did rely on, and some of the other Eighth Circuit precedent, I think that's very clear. But even if you assume that it is, the undisputed evidence indicates that this employer was doing what employers are supposed to do. They were having a meeting with their employee to tell them, look, here's the problems that we're seeing, and here's what you need to do to correct it moving forward. That's all they were doing. Despite the fact that he had these behavioral issues, they weren't looking to fire him. They were looking to sit down with him and talk about where we go from here so that he can correct things by the end of the year when the performance evaluation would matter and would affect his pay and those kinds of things. So moving to that, then in the meeting, I agree with Ms. Brown that there are two different stories about what happened in that meeting. But for purposes of our motion, we have assumed that what Mr. Couch says happened, happened. And what he admits, and everything that he points to in his briefing regarding what happened in that meeting, is in the e-mail that Roger Marine sent after the meeting. And I went through that e-mail with Mr. Couch in his deposition, and I asked him, did you say this? And he said yes in every instance. He told, again, here we are, six weeks in, he's meeting with the supervisor about a mid-year review to, in his words, talk about where he is and where he's going. You can go ahead and stop this because it's all BS. I will not sign this. This is garbage. Ken wants me out of here so he can continue to replace us with our West Point buddies, on and on. Whether or not he stopped the review or whether or not he said I don't want to talk about this anymore until HR is irrelevant, that's not the point. Mr. Marine's testimony was actually that he didn't even get through the first page. We're assuming for purposes of this motion that they got through three pages because that was Mr. Couch's testimony. So the point is this. The facts and the timing, when you look at that, and the Eighth Circuit law is very clear. I think I read 20 cases that all say that timing alone is not sufficient. You have to have something more than timing. And in order to try to show something more than timing, Mr. Couch has done a couple of things. First of all, he has misrepresented what the record says and said that Mr. Marine quote, unquote, unequivocally testified that the reason for his termination was the statements he made in his review, which is not what Mr. Marine said. Mr. Marine was asked that question five times in his deposition, and it's never what he said. What he said was we ultimately got there because he wouldn't even sit down with us and listen to what his performance problems were and where he needed to go. He just wouldn't even sit down with us. There are other places that the record is misrepresented, which we've talked about. But the other thing is he points to things like the timing. We've talked about the timing and how it was simply a matter of circumstance. That's when the midyear reviews are given. He also tries to say that his behavior concerns previous to that were not documented. Okay, well, if we had documented them, we can see what that argument would have been. But the real issue here is that Roger Marine had only started six weeks earlier. He didn't come in and start writing them up. What he did was try to talk to him and then brought him in for his midyear evaluation again to talk to him. These are people who had just taken over the plant. Mr. Murray, who had been the plant manager for years, had passed away. Ken Verhulst took over on an interim basis, and then Roger Marine came in, which is another argument that they try to make, saying, well, Ken Verhulst never evaluated him before and he didn't evaluate others. Well, on the never evaluated him before part, that's because he had never been his direct supervisor, which he was on this issue. And on the didn't evaluate anyone else, that's simply false and not supported in the record. So Mr. Couch has tried to add the timing plus, but it's simply not there. And in the situations in the case law where the courts did find a fact question, there was something more than just the timing. And for example, one of the cases cited is Bassett versus the city of Minneapolis. In that case, the plaintiff had engaged in problematic behavior prior to filing the charge, then received a performance evaluation that was positive, then filed a charge, and then got written up for the behavior that had occurred before the performance evaluation. So that's an example of something where you've got bad timing and something else. In this situation, we simply don't have that. The undisputed facts, again, based on almost solely on Mr. Couch's own testimony, illustrate that the employer was simply doing what it had to do at the time that it always did it. And there simply isn't any evidence of retaliation, regardless of which standard the court uses. I appreciate your time. Thank you. Thank you. Ms. Brown, have some time for rebuttal?  And I actually want to ask sort of a preliminary question that's really bothering me. Is this interim performance review point? You might have addressed it anyways, but it gets back to my arm point, which I can't figure out whether the performance review is really an adverse employment action or Burlington Northern. So what's your best argument that it is? So my best argument is, of course, that it has to be considered within the totality of the circumstances. Additionally, Tim Couch's testimony was that the midyear adverse employment review was tied. I mean, the reason that he was upset was not only that it was, of course, the first negative review that he'd ever had, but also that ultimately it was a projection of his end-of-year review or tied to his bonus structure. His ratings were, I mean, how he rated on his performance tied to ultimately his bonus that he received as a manager. That midyear review did, not the final review. So the midyear review, his testimony was that the bonus is tied to the final review, but that the midyear review does reflect what his, I mean, it's a half a year, as to what his final year evaluation score is going to be. So, you know, it was in his position setting, you know, again, he was performing well on all objective measures on his review because those can't be fudged. And so on these behavioral issues for which there were no other witnesses. Oh, wait a minute. The Hoagland complaint is not inconsistent with him being above reproach on any objective analysis? No, his. The fact that a fellow, that an employee under his supervision had complained that he was making her feel like she was going to be punished. So the employment review process at this manufacturing facility has several objective measures, which Dr. Pepper concedes that Tim Couch performed well on all of them. They're measured year after year using the same metrics. And so the issue as to the employee complaint, which was not addressed in this negative employment review. Is there a line for a production manager treats underlings appropriately? Dr. Pepper raised what they asserted were his behavioral issues in the negative employment review. I just asked you a question. You talked about this form is locked in and so forth. And so I said, does it have a line that would measure or allow evaluation of that? What I consider an objective aspect of performance, but tends to be subjectively influenced. There are what Dr. Pepper characterizes as subjective factors that go into the employment review. Yes, what they call manager attributes. So if that's your question, were they entitled to review him on his? Yes. You say he was objectively perfect. It's because you are characterizing as subjective some aspects that are regularly evaluated. I'm not saying that he was objectively perfect. What I said was that the review undisputably has objective measures, which Dr. Pepper has been forced to concede he performed well on all of those metrics. And yet his overall rating was low. I mean, lower than it ever had been. And the lowest of all of his managerial colleagues. Could it just be that his new supervisor, and I apologize for going over, that his new supervisor was just a harder grader? I used to be a law school professor. Some people are harder graders than others. Sure, it could be. Except he's a member of a five-manager team, and he was the only one that received a negative review, and also the only one that filed a complaint. So, thank you. Thank you, counsel.